UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

ALLEN EUGENE GREGORY,

                Petitioner,

    v.

DONALD R. HOLBROOK,

                Respondent.

CASE NO. 3:22-CV-5426-TL-DWC

REPORT AND RECOMMENDATION

Noting Date: April 12, 2024

       The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Allen Eugene Gregory, proceeding with Court-appointed counsel from the Federal Public Defender's Office, filed his federal habeas petition, pursuant to 28 U.S.C. § 2254, seeking relief from his state court conviction and sentence. *See* Dkts. 1, 19, 22. The Court concludes Ground 4 is not cognizable under § 2254 and the state court's adjudication of the remaining eight grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Petition be denied and a certificate of appealability not be issued.

**I.      Background**

    A.  <u>Factual Background</u>

       In 2001, in the Superior Court of Washington for Pierce County ("trial court"), a jury found Petitioner guilty of murder in the first degree (premeditated murder). *See* Dkt. 13-1

1    (Exhibit 1). The Supreme Court of the State of Washington ("state court supreme court")

2    summarized the facts of Petitioner's case as follows:

3        In 1996, two years before the R.S. rapes, 43–year–old G.H. moved into a house
         next door to her mother's. On July, 27, 1996, when G.H. did not show up for work
4        at the restaurant where she was employed as a bartender, her co-workers became
         concerned and sent someone to check on her. A co-worker found the back door of
5        G.H.'s residence unlocked. She let herself in, looked through the house, and found
         G.H.'s body face down on her bed.
6
         The evidence suggested that G.H. had been attacked in her kitchen. She was
7        probably stabbed once in the neck and then dragged into her bedroom. G.H.'s work
         clothes had been cut off of her, and her hands were tied behind her back with apron
8        strings. She was then stabbed three times in the back. In addition, she had three
         deep slicing wounds to the front of her throat. One of the throat wounds was
9        inflicted so violently that a vertebra in G.H.'s neck was broken. The medical
         examiner concluded that G.H. suffered blunt force trauma to the head and she had
10       several bruises, but the cause of death was multiple sharp force injuries to her back
         and neck. Semen was found in G.H.'s anal and vaginal swabs, on her thigh, and on
11       the bedspread. The evidence suggested that she was still alive when she was raped.
         Missing from her home were a pair of diamond earrings, jewelry, and her cash tips
12       from that evening.

13       Gregory lived with his grandmother across an alley from G.H.'s home. Police began
         to suspect him of complicity in the murder when he gave them inconsistent
14       statements about his whereabouts at the time of the crime. However, the police
         could not definitively connect him to the crime until 1998. In 1998, DNA analysis
15       of semen found at the G.H. crime scene was compared with blood samples obtained
         from Gregory in the R.S. rape case. The Washington State Patrol, the Federal
16       Bureau of Investigation (FBI), and a private lab all reported that Gregory was, to a
         high degree of probability, the source of the semen found at the G.H. crime scene.
17       The various DNA tests compared differing alleles and thus produced varying odds
         of a random match. For example, the private lab, conducting short tandem repeat
18       (STR) DNA testing, concluded that the chance of a random match in the African
         American population was 1 in 190 billion. The Washington State Patrol, conducting
19       restriction fragment length polymorphism (RFLP) DNA testing, concluded that the
         chance of a random match was 1 in 235 million.
20       Gregory was already incarcerated awaiting trial in the R.S. rape case. He was
         questioned and then charged with aggravated murder in the first degree for the G.H.
21       murder. The aggravating circumstance was that he committed the murder in the
         course of rape in the first degree and robbery in the first degree. The State elected
22       to seek the death penalty. After a lengthy trial, the jury found Gregory guilty of
         aggravated first degree murder. Evidence was then presented to the same jury at the
23       penalty phase. The jury concluded that "[h]aving in mind the crime of which the
         defendant [was] found guilty," it was convinced "beyond a reasonable doubt that

24

1

2

there [were] not sufficient mitigating circumstances to merit leniency." MCP at 2983. Accordingly, Gregory was sentenced to death.

3

4

Dkt. 13-1 (Exhibit 3); *State v. Gregory*, 158 Wash. 2d 759, 811–12, 147 P.3d 1201, 1229–30 (2006).

5

B. Procedural Background

6

1. *Direct Appeal*

7

8

9

10

11

On May 25, 2001, the trial court formally sentenced Petitioner to death. *See* Dkt. 13-1 (Exhibit 1). Petitioner challenged his convictions and sentence on direct appeal. *See id*. On November 30, 2006, the state supreme court affirmed Petitioner's conviction, but reversed his death sentence and remanded to the trial court for a new penalty phase. *See id*. Petitioner had a new penalty phase and, on June 13, 2012, the trial court again formally sentenced Petitioner to death. *Id*.

12

13

14

15

16

17

Petitioner appealed the new judgment and sentence. Dkt. 13-2 (Exhibit 15). The state supreme court vacated the death sentence and converted Petitioner's sentence into the sentence of life without parole based on the unconstitutionality of the death penalty in Washington State. Dkt. 13-2 (Exhibit 20). The state supreme court declined to consider claims that the court had decided on the previous appeal. *See id*. The state supreme court entered the mandate on November 7, 2018. Dkt. 13-2 (Exhibit 21).

18

2. *Personal Restraint Petition*

19

20

21

22

23

Petitioner filed a state collateral attack, a personal restraint petition ("PRP"), on October 10, 2019. Dkt. 13-2 (Exhibit 22). The Court of Appeals of the State of Washington ("state court of appeals") denied the PRP regarding Petitioner's conviction. Dkt. 13-3 (Exhibit 30). Petitioner sought discretionary review from the state supreme court. Dkt. 13-3 (Exhibit 31). On May 4,

24

2022, the state supreme court denied the motion for discretionary review without comment. Dkt. 13-3 (Exhibit 34). The certificate of finality was issued on May 5, 2022. Dkt. 13-3 (Exhibit 35).

     3.  *Federal Petition*

On June 9, 2022, Petitioner initiated this case. Dkt. 1. In his Petition (Dkt. 3), Petitioner raises the following nine grounds for relief:

1.  The trial court erred when excusing Juror No. 1 for cause because of her views on the death penalty in violation of *Witherspoon v. Illinois*, *Wainwright v. Witt* and the Sixth and Fourteenth Amendments.

2.  The trial judge improperly excluded Petitioner's aunt from the courtroom thereby violating the right to a public trial protected by the Sixth Amendment.

3.  There was insufficient evidence of premeditation and thus insufficient evidence for aggravated murder in violation of the Fourteenth Amendment's Due Process Clause and *Jackson v. Virginia*.

4.  The warrant used to search Petitioner's car and seize a knife used against him at trial and the two court orders used to seize his blood which became the main evidence against him at trial were constitutionally invalid in violation of the Fourth, Sixth, and Fourteenth Amendments. They were the result of falsehoods told by an employee of the police and the result of either intentional or reckless omissions of material facts by the police and prosecutors, all in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). The warrant and blood draw orders were also the result of violations of *Brady v. Maryland*, 373 U.S. 83 (1963), *Strickland v. Washington*, 466 U.S. 688 (1984), and the right to counsel and due process clauses of the Sixth and Fourteenth Amendments.

5.  The use of a stun belt on Petitioner during the trial violated due process of law and the right to a fair jury trial protected by the Sixth and Fourteenth Amendments, and its use also violated Article 10 of the International Covenant of Civil and Political Rights.

6.  Petitioner's conviction rests of a verdict from a jury infected by racial bias in violation of the Sixth and Fourteenth Amendments.

7.  Prejudicial prosecutorial misconduct in closing argument denied Petitioner due process of law and a fair jury trial in violation of the Sixth and Fourteenth Amendments, and the failure to raise all aspects of this argument on direct appeal denied Petitioner due process under the Fourteenth Amendment and *Evitts v. Lucey*, 469 U.S. 387 (1985).

8. The admission of evidence that Petitioner refused to give a recorded statement to the police violated due process under the Fourteenth Amendment.

9. The introduction of evidence that Petitioner did not contact the homicide detectives when they asked his grandmother to pass on a message to him to do so violated Petitioner's Fifth Amendment right to remain silent.

Dkt. 3 at 5-29.

On September 30, 2022, Respondent filed, and served on Petitioner, an Answer to the Petition. Dkts. 12, 13. In the Answer, Respondent asserts that the Petition should be denied because the grounds for relief are moot or not cognizable or because the state court's adjudication of the grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 12. On March 13, 2023, the Court appointed the Federal Public Defender's Office to represent Petitioner. Dkt. 22. Petitioner, through counsel, filed a Traverse on September 11, 2023. Dkt. 29. Respondent filed a Reply to the Traverse on September 14, 2023. Dkt. 30.

In the Traverse, Petitioner only discusses Grounds 1 and 4. Dkt. 29. But, Petitioner states that he does not waive any other claim for relief in his Petition. *Id.* at 2. The Court will discuss every ground raised in the Petition. However, the Court notes that Petitioner's decision to forego briefing Grounds 2, 3, and 5-9 requires the Court to rely only on the arguments articulated in the Petition.

**II.    Discussion**

A.    Standard of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this

portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

    B.  <u>Jury Instruction Error (Ground 1)</u>

       Petitioner first asserts the trial court erred when it excused Juror No. 1 for cause based on her views on the death penalty. Dkt. 3 at 5.

       Trial by an impartial jury is fundamental to the fair administration of criminal justice. *Turner v. State of La.*, 379 U.S. 466, 472-73 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). An impartial jury is one that is composed of "jurors who will conscientiously apply the law and find the facts." *Lockhart v. McCree,* 476 U.S. 162, 178 (1986) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)). A juror is considered impartial under the Sixth Amendment standard if the juror can set aside any opinion he or she might hold and decide the case solely on the evidence presented at trial. *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

       The trial court may grant the state's motion to exclude for cause a juror if the juror's view on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt,* 469 U.S. at 424 (citing *Adams v. Texas,* 448 U.S. 38, 45 (1980)). Examples of the proper application of *Witt* range from the dismissal of a juror who references the power of nullification, *Merced v. McGrath,* 426 F.3d 1076, 1080-81 (9th Cir. 2005), to jurors who state that they would automatically vote against the death penalty in the sentencing phase, *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992).

       The Supreme Court has clearly established, however, that even jurors "who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart*, 476 U.S. at 176. So long as a juror clearly states his ability to follow the court's instructions, he is qualified under *Witt.* In other words, the only reason the state may

move to exclude a juror for cause under *Witt* is if a juror conveys that he will not be able to follow the instructions. *Gray v. Mississippi,* 481 U.S. 648, 658 (1987) ("The State's power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would 'frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths.'" (quoting *Witt,* 469 U.S. at 423)). A juror who will be able to follow instructions may not be excused under *Witt.*

Respondent argues that Ground 1 is moot. Dkts. 12, 30. Respondent contends that, because Petitioner's death sentence was vacated, any constitutional claim related to the "death qualification" is moot. Petitioner asserts that arguing the claim is moot is "offensive." Dkt. 29 at 24. It appears Petitioner contends that, because there are studies showing the process of death qualification biases jurors in the guilt phase of deliberations, Ground 1 is not moot. *Id.*

The Ninth Circuit has held that "to the extent that death qualification affects deliberations, it does so at the penalty phase, not at the guilt phase, where jury discretion is closely channeled." *Furman v. Wood*, 190 F.3d 1002, 1005 (9th Cir. 1999). Here, Petitioner's death sentence was vacated. As the death qualification does not deny a capital defendant a fair guilt phase, the claim became moot when his death sentence was deemed unconstitutional by the state supreme court.

Respondent next asserts that, even if Ground 1 is not moot, the ground does not rest on clearly established federal law. Dkt. 12 at 15-16. Petitioner does not appear to directly respond to this argument. *See* Dkt. 29. As stated above, "death qualification does not deny the capital defendant a fair guilt phase trial." *Furman*, 190 F.3d at 1004–05 (citing *Lockhart*, 476 U.S. at 168–73, 174–77). Moreover, "[t]he Supreme Court has found no support for the conclusion that death qualification produces a conviction-prone jury and further has determined that death

qualification does not affect the rights of a non-capital defendant." *Najar v. Ryan*, 2013 WL 1693681, at *9 (D. Ariz. Apr. 18, 2013) (citing *Furman*, 190 F.3d at 1004–05). Rather, the Supreme Court has stated, "We simply cannot conclude . . . that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Witherspoon v. State of Ill.*, 391 U.S. 510, 518, 523 n.21 (1968) (stating explicitly that its reversal of the death sentence did not affect the conviction). In another case where the death sentence was reversed based on counsel not being allowed to ask jurors whether they would automatically impose a sentence of death upon a finding of guilt, the Court specifically noted that "[o]ur decision today has no bearing on the validity of petitioner's conviction." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (citing *Witherspoon*, 391 U.S. at 523 n.21). Petitioner has not cited to, nor does the Court find, clearly established Supreme Court precedent holding any alleged error related to a "death qualified" jury violates a petitioner's constitutional rights related to the conviction phase.

Finally, Respondent asserts that, even if Ground 1 is not mooted and there is clearly established federal law, the state court's adjudication of Ground 1 is not contrary to, or an unreasonable application of clearly established federal law. Dkt. 12.

In finding Petitioner was not entitled to relief on Ground 1, the state supreme court found:

> Gregory argues that juror 1 was improperly dismissed for cause. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to an impartial jury. *State v. Brown,* 132 Wash.2d 529, 593, 940 P.2d 546 (1997), *cert. denied,* 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998). In order to protect a defendant's right to a fair sentencing hearing, as well as the State's ability to present its arguments to an impartial tribunal, the trial court in a death penalty case must "death qualify" the jury. *Brown,* 132 Wash.2d at 593, 940 P.2d 546; *see also Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
>
> Death qualification is the process whereby the trial court may dismiss prospective jurors for cause if the juror's philosophical views against the death penalty would

" 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Witt,* 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); *State v. Davis,* 141 Wash.2d 798, 856–57, 10 P.3d 977 (2000). The juror's bias need not be " 'unmistakably clear' " before dismissal is allowed. *Witt,* 469 U.S. at 424–25, 105 S.Ct. 844 (rejecting the *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) test). Instead the trial judge can dismiss a juror when "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Witt,* 469 U.S. at 425–26, 105 S.Ct. 844. Deference must be paid to the trial judge who sees and hears the juror. *Id.* at 426, 105 S.Ct. 844.

Under the *Witt* test, a juror may express scruples about capital punishment, or even personal opposition to the death penalty, so long as he or she can ultimately defer to the rule of law. *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Whether a juror can set aside personal feelings about the death penalty involves a credibility determination that is necessarily factual in nature. *Witt,* 469 U.S. at 429, 105 S.Ct. 844. A trial court's ruling on a challenge for cause is reviewed for manifest abuse of discretion. *Brown,* 132 Wash.2d at 601–02, 940 P.2d 546.

In this case, juror 1 indicated seven times that if the alternative was life with no chance of release, then she could not vote for the death penalty. In contrast, she later testified that she thought she could follow the court's instructions and impose the death penalty if the State proved death was warranted beyond a reasonable doubt. Significantly, she said that she could tell which answers counsel were looking for and she was not comfortable in disagreeing with the attorneys. She explained the inconsistencies in her answers by stating that she had had time to think about the issue. The State challenged juror 1 for cause, and the defense objected. After argument, the trial court concluded:

> This juror repeated approximately three times according to my notes, when asked if she could vote for the death penalty if she knew a person could get life in prison without parole, she said "probably not" at least three times. I know that on her questionnaire and during some of her other answers, she stated that she could if it was a serial murder type of case.

> I believe it's very clear from her answers that she probably is not capable of voting for the death penalty, knowing the alternative is life in prison. So I will grant the state's challenge for cause.

MRP at 2224.

Given juror 1's initial answers to questions regarding the death penalty and the suggestion that she changed her answers to please the attorneys, it is not surprising that the trial judge had the definite impression that juror 1 could not "faithfully and

> impartially apply the law." *Witt,* 469 U.S. at 426, 105 S.Ct. 844. "[D]eference must be paid to the trial judge who sees and hears the juror." *Id.* We find there is ample evidence in the record to support the dismissal for cause and hold that the trial court did not abuse its discretion.

Dkt. 13-1 at 38-39 (footnote omitted); *Gregory*, 158 Wash. 2d at 813–15.

The record reflects that, during voir dire, Juror No. 1 was extensively questioned individually about her beliefs regarding punishments. Dkt. 13-4 at 204-27. Juror No. 1 stated that she thought life without the possibility of parole was an adequate punishment for someone who committed a murder. *Id*. at 205. She indicated she was generally opposed to the death penalty unless a defendant was released and continued to commit crimes. *Id*. at 206. When Juror No. 1 was asked if she could never vote for the death penalty she stated "No." *Id*. at 207. She stated that she would not consider the death penalty if the other sentencing option was life in prison, because the person would die in prison. *Id*. at 208. Juror No. 1 would rather a person spend their life in prison than vote for the death penalty. *Id*. When asked if Juror No. 1 would ever consider imposing the death penalty knowing the other option was life in prison without the possibility of parole, she said, "Probably not, no." *Id*. at 208-09. Juror No. 1 further stated that she would still vote for life in prison even if the State met its burden to prove that death was the appropriate sentence in this case. *See id*. at 209-10. However, she stated that she could follow the court's instructions regarding imposition of the death penalty. *Id*. at 210-11.

The prosecutor asked Juror No. 1 if she would require the State to prove the defendant had killed before, she stated "probably, yeah." *Id*. at 215. She expanded stating that, if there was no evidence the defendant had killed before, she could probably never vote for death and she would vote for life in prison because the defendant would not be able to kill again. *Id*. at 216. The prosecutor asked her if she was capable of voting to send someone to death row and Juror No. 1 responded, "Probably not, no." *Id*. at 219. Juror No. 1 indicated she could tell the answers

the attorneys were seeking from her and she was not comfortable disagreeing with someone who told her something. *Id*. at 225-26. However, by the end of questioning, Juror No. 1 stated she believed she could probably vote to send someone to death row and could follow the court's instructions. *Id*. at 220-27.

The State challenged Juror No. 1 for cause based on her views regarding the death penalty. Dkt. 13-4 at 227-28. The prosecutor noted Juror No. 1's inconsistent answers regarding the death penalty, her desire to answer a certain way, and her demeanor. *See id*. Petitioner's trial counsel argued against striking Juror No. 1 because she was open to the possibility that death is an appropriate sentence. *Id*. at 229-30.

The trial court found that it was clear from Juror No. 1's answers that she was probably not capable of voting for the death penalty knowing the alternative is life in prison. Dkt. 13-4 at 231. The trial court, therefore, granted the State's challenge for cause. *Id*.

On habeas review, determinations as to individual juror bias in both trial and capital sentencing juries are factual questions entitled to the presumption of correctness. *Witt*, 469 U.S. 412; *see also Darden v. Wainwright*, 477 U.S. 168, 175 (1986); *Patton*, 467 U.S. 1025 (finding that impartiality of individual jurors is a question of fact). The determination also is "essentially one of credibility, and therefore largely one of demeanor," and the resolution of such issues by the trial court is entitled to "special deference." *Patton*, 467 U.S. at 1038. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). A trial court's findings of juror impartiality may be overturned "only for 'manifest error.' " *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991) (quoting *Patton*, 467 U.S. at 1031). The question is whether there is "fair

1    support" in the record for the court's conclusion that a juror would be impartial. *Patton*, 467 U.S.

2    at 1038.

3         The record reflects that the trial court, after hearing Juror No. 1's answers and argument

4    from counsel, determined Juror No. 1's view on capital punishment would "substantially impair

5    the performance of h[er] duties as a juror in accordance with h[er] instructions and h[er] oath.'"

6    *Witt*, 469 U.S. at 424. The trial judge determined that, based on Juror No. 1's answer, she would

7    probably not be able to invoke the death penalty. The trial judge's "failure to use specific words

8    which, through Supreme Court imprimatur, authoritatively invoke the substantial impairment

9    standard is no impediment to that judge's words having done so here." *Gentry v. Morgan*, 2006

10   WL 2473496, at *7 (W.D. Wash. Aug. 28, 2006); *Witt*, 469 U.S. at 432 ("The fact that a

11   particular verb is used in a key passage of an appellate opinion stating the standard for excusing

12   jurors for cause does not mean that that word, and no other, must be used in all the thousands of

13   subsequent proceedings in which the prosecution challenges jurors for cause."). This Court finds

14   that the trial court reasonably applied the substantial impairment standard in excusing Juror No.

15   1.

16        There is also abundant evidence in the record to support the trial court's finding. As

17   detailed above, Juror No. 1 stated several times that she would not be able to impose a death

18   sentence if the alternative was life without parole. She indicated she was providing answers to

19   questions based on what she thought the attorneys wanted her to say. Juror No. 1 did state that

20   she would be able to impose the death penalty if she was so instructed. However, when there

21   were other sentencing options available to her, she still stated she could only "probably" impose

22   the death sentence. The colloquy also indicated Juror No. 1's demeanor did not indicate she

23   would be able to vote for death over life without parole. On several occasions, Juror No. 1

24

1  provided adequate grounds for a for-cause challenge under the *Witt* substantial impairment

2  standard. The Court defers to the trial court's conclusion that Juror No. 1's view on the death

3  penalty substantially impaired her ability to follow the court's instructions. Therefore, Petitioner

4  fails to demonstrate the state court's conclusion that the trial court did not err when it excused

5  Juror No. 1 for cause based on her views on the death penalty was contrary to, or an unreasonable

6  application of, clearly established federal law.

7       For the above stated reasons, Ground 1 of the Petition should be denied.

8      C.  Right to Public Trial (Ground 2)

9       In Ground 2, Petitioner alleges his Sixth Amendment right to a public trial was violated

10  when the trial judge improperly excluded Petitioner's aunt. Dkt. 3 at 7.

11       The Sixth Amendment guarantees a defendant the right to a public trial. U.S. Const.

12  amend. VI; *Press–Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 511 (1984).

13  "Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule,

14  that judges, lawyers, witnesses, and jurors will perform their respective functions more

15  responsibly in an open court than in secret proceedings." *Waller v. Georgia*, 467 U.S. 39, 46 n. 4

16  (1984) (quoting *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring)). However, the

17  right to a public trial is not absolute and must give way to other interests essential to the fair

18  administration of justice. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606 (1982);

19  *Waller*, 467 U.S. at 45. Federal courts have recognized limitations on the right to a public trial

20  where a judge has excluded spectators during a witness's testimony for a justifiable purpose. *See*

21  *United States v. Akers,* 542 F.2d 770, 772 (9th Cir.1976) (to avoid disorder); *United States v.*

22  *Eisner,* 533 F.2d 987, 993–94 (6th Cir. 1976) (to protect witness with fear of testifying in

23

24

public); *United States ex rel. Orlando v. Fay,* 350 F.2d 967, 971 (2d Cir. 1965) (to maintain order in the courtroom).

Here, in determining Petitioner's right to a public trial was not violated, the state supreme court ruled:

> Gregory argues that when the trial court required his aunt, Tonetta Johnson, to leave the courtroom for the duration of his grandmother's testimony, the court closed the courtroom in violation of his right to a public trial under the Sixth Amendment and article I, section 22 of the Washington Constitution. *State v. Brightman,* 155 Wash.2d 506, 514, 122 P.3d 150 (2005); *In re Pers. Restraint of Orange,* 152 Wash.2d 795, 804, 100 P.3d 291 (2004). At trial, the State called Mae Hudson, Gregory's grandmother, to testify. The trial judge abruptly interrupted, excused the jury, and asked Hudson to step out of the courtroom. Then, the trial judge explained:

>> Counsel, I have been observing that the woman seated behind [defense counsel] on the last question was shaking her head no to the witness before the witness was answering.

> MRP at 5051–52. The judge ordered Johnson to step outside of the courtroom for the duration of Hudson's testimony. The court further explained:

>> I earlier had seen [Johnson] smiling and laughing at the witness, but it wasn't until this last question about the facial hair that I saw her shaking her head no to Ms. Hudson. So I wanted the state and defense counsel to be apprised of that and why I need to exclude her from the courtroom.

>> Is there any objection to that from the defense?

> MRP at 5052. Defense counsel had no objection. The court ordered:

>> She needs to definitely stay outside for the rest of the testimony. This could be as simple as prompting the witness, or it also could be tampering with the witness in this case. I am especially concerned because this witness may be having some memory problems in this regard. She will need to remain outside the rest of the time.

> MRP at 5053. After Hudson's testimony, Johnson returned to the courtroom and apologized.

> In *Brightman, Orange* and *State v. Bone–Club,* 128 Wash.2d 254, 906 P.2d 325 (1995), the trial court ordered that *all* spectators be excluded from the courtroom during some part of the trial. *See Brightman,* 155 Wash.2d at 511, 122 P.3d 150; *Orange,* 152 Wash.2d at 802, 100 P.3d 291; *Bone–Club,* 128 Wash.2d at 256–57,

906 P.2d 325. The *Orange* and *Bone–Club* courts emphasized that the closures in those cases were full closures. *Orange,* 152 Wash.2d at 808, 100 P.3d 291; *Bone–Club,* 128 Wash.2d at 256–57, 906 P.2d 325. Here, the trial court never fully closed the courtroom. Further, neither *Orange, Brightman,* nor *Bone–Club* explicitly limited or undermined the trial court's inherent authority to regulate the conduct of a trial by excluding one person from the courtroom for a limited period of time. *See, e.g., State v. Pacheco,* 107 Wash.2d 59, 67–68, 726 P.2d 981 (1986). The trial judge here explained the reason for excluding Johnson, she offered the defendant a chance to object, which he chose not to do, and she limited the exclusion to the duration of Hudson's testimony. [Fn. It is important to note that the Ninth Circuit has held that where there is only a Sixth Amendment challenge (rather than a First Amendment challenge) to exclusion of a defendant's family member or members, the hearing requirement is met where the court has given *the defendant* an opportunity to object. *United States v. Sherlock,* 962 F.2d 1349, 1358 (1989).] Under these circumstances, it cannot be said that the trial court abused its broad discretion to regulate the conduct of a trial. We conclude that Gregory's right to a public trial was not violated.

Dkt. 13-1 at 39-40; *Gregory*, 158 Wash. 2d 759, 815–16.

Here, the record reflects, and Petitioner does not contest, that Petitioner's aunt, Ms. Johnson, was smiling and laughing at Petitioner's grandmother, Ms. Hudson, while Ms. Hudson was testifying. *See* Dkt. 13-5 at 305-308. The trial judge stated that it was not until Ms. Johnson shook her head "no" at Ms. Hudson that she felt it necessary to remove Ms. Johnson from the courtroom. *See* Dkt. 13-5 at 307. Despite being given the opportunity to object, Petitioner's counsel did not object to Ms. Johnson's removal and Ms. Johnson was allowed to return after Ms. Hudson completed her testimony. *Id.* The scope of the courtroom closure was narrowly tailored to address the concern for witness tampering. Ms. Johnson was the only one removed from the courtroom and only during the time that Ms. Hudson was testifying.

Petitioner was given an opportunity to be heard before the temporary closure and the trial judge made adequate findings to support the temporary closure – the trial judge was concerned about witness prompting/tampering and the witness's memory. Additionally, rather than completely removing Ms. Johnson from the courtroom, the trial judge allowed Ms. Johnson to

1    return after the completion of Ms. Hudson's testimony. Therefore, Petitioner has not shown his

2    public trial rights under the Sixth Amendment were violated. *See Freeman v. Miller-Stout*, 2009

3    WL 2511962, at *12 (W.D. Wash. Aug. 12, 2009) (finding the temporary exclusion of the

4    petitioner's fiancé from the courtroom for the duration of two witnesses' testimony due to a valid

5    anti-harassment order did not violate Petitioner's right to a public trial); *Bunn v. Lopez*, 2016 WL

6    4010038, at *14 (E.D. Cal. July 26, 2016), *subsequently aff'd*, 740 F. App'x 145 (9th Cir. 2018)

7    ("No United States Supreme Court case holds that a defendant's right to a public trial is violated

8    by less than a total closure of the courtroom[.]").

9        Therefore, Petitioner fails to demonstrate the state court's conclusion that Petitioner's right

10   to a fair trial was not violated based on the trial judge's decision to remove Ms. Johnson from the

11   courtroom during the remainder of Ms. Hudson's testimony was contrary to, or an unreasonable

12   application of, clearly established federal law. Accordingly, Ground 2 of the Petition should be

13   denied.

14       D.  Insufficient Evidence (Ground 3)

15       In Ground 3, Petitioner alleges there was insufficient evidence of premeditation and, thus,

16   he could not be convicted of aggravated murder. Dkt. 3 at 8.

17       The Constitution forbids the criminal conviction of any person except upon proof of guilt

18   beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). When evaluating a claim of

19   insufficiency of the evidence to support a conviction, the reviewing court must decide "whether,

20   after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

21   could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

22   *Virginia*, 443 U.S. 307, 319 (1979). "*Jackson* leaves juries broad discretion in deciding what

23   inferences to draw from the evidence presented at trial, requiring only that jurors 'draw

24

1    reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650,

2    132 S.Ct. 2060, 2064 (2012) (quoting *Jackson*, 443 U.S. at 419). The jury is entitled to believe

3    the State's evidence and to disbelieve the defense's evidence. *Wright v. West*, 505 U.S. 277, 296

4    (1992).

5          Petitioner was convicted of murder in the first degree (premediated murder) of G.H. *See*

6    Dkt. 13-1 (Exhibit 1). The state supreme court found the evidence was sufficient to convict

7    Petitioner, stating:

8          Gregory argues that there was insufficient evidence in the record to support the
         element of premeditation. Evidence is sufficient to support a finding of guilt if
9          "viewed in the light most favorable to the state, a rational trier of fact could have
         found guilt beyond a reasonable doubt." *State v. Clark,* 143 Wash.2d 731, 769, 24
10         P.3d 1006, *cert. denied,* 534 U.S. 1000, 122 S.Ct. 475, 151 L.Ed.2d 389 (2001).
         "All reasonable inferences from the evidence must be drawn in favor of the state
11         and interpreted most strongly against the defendant." *Id.*

12         The legislature has declared that the premeditation necessary to support conviction
         for murder in the first degree must "involve more than a moment in point of time."
13         RCW 9A.32.020(1). This court has defined premeditation as

14             deliberate formation of and reflection upon the intent to take a human life
             [that] involves the mental process of thinking beforehand, deliberation,
15             reflection, weighing or reasoning for a period of time, however short.

16         *State v. Hoffman,* 116 Wash.2d 51, 82–83, 804 P.2d 577 (1991). Premeditation may
         be proved by circumstantial evidence where inferences supporting premeditation
17         are reasonable and the evidence is substantial. *Clark,* 143 Wash.2d at 769, 24 P.3d
         1006.

18

19         This court has found that sufficient evidence supported the jury's finding of
         premeditation in cases where multiple wounds were inflicted with a knife or other
20         weapon, there were signs of a struggle, the victim was at some point struck from
         behind, and there was evidence that sexual assault or robbery was an underlying
21         motive. *Id.* at 769–70, 24 P.3d 1006; *State v. Gentry,* 125 Wash.2d 570, 599–601,
         888 P.2d 1105, *cert. denied,* 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995);
22         *State v. Ortiz,* 119 Wash.2d 294, 312–13, 831 P.2d 1060 (plurality), 315 (Dolliver,
         J., concurring), 119 Wash.2d 294, 831 P.2d 1060 (1992); *State v. Ollens,* 107
23         Wash.2d 848, 853, 733 P.2d 984 (1987). In *Clark,* the seven-year-old victim was
         stabbed at least seven times in the neck, cuts on her hands suggested a struggle, and
24         she was sexually assaulted. 143 Wash.2d at 739, 769–70, 24 P.3d 1006. In *Gentry,*

the defendant picked up a large rock to use as a weapon, he struggled with the victim over the course of 148 feet of a wooded trail, blows were struck on both sides of the victim's head, and sexual assault was apparently attempted. 125 Wash.2d at 600–01, 888 P.2d 1105. In *Ortiz,* the victim was found in her home, defensive wounds indicated a prolonged struggle through more than one room, and the victim had been raped. 119 Wash.2d at 297, 312–13, 831 P.2d 1060. In *Ollens,* the victim was stabbed several times with a knife and his throat was then slashed, the victim was struck from behind, and the evidence suggested that robbery was the motive. 107 Wash.2d at 849, 853, 733 P.2d 984.

The facts in the instant case similarly evince premeditation. There was no sign of forced entry into G.H.'s house, G.H. was stabbed in the throat in her kitchen and then dragged to her bedroom, G.H.'s hands were tied behind her back, her clothes were cut off of her, and G.H. was stabbed three times in the back, her throat was slit three separate times, and a vertebra in her neck was fractured. Despite her severe injuries, G.H. struggled. G.H. was raped both vaginally and anally before she died. Moreover, none of G.H.'s tip money from that evening was found, and the diamond earrings that she always wore were never recovered. Juxtaposing the facts of the instant case with those from the cases discussed above, it is evident that here there was equally substantial evidence from which the jury could have found premeditation. We conclude that there is sufficient evidence to support a finding of premeditation.

Dkt. 13-1 at 40; *Gregory*, 158 Wash. 2d at 816–18.

Petitioner asserts only that the evidence presented at trial failed to show he deliberated, reflected and decided before-hand to take a life. Dkt. 3 at 8. As Petitioner does not contest the state supreme court's evidentiary findings, the Court declines to restate the evidence detailed in the state supreme court's opinion. However, the Court notes the state court record is consistent with the state supreme court's findings. *See e.g.*, Dkt. 13-4 at 575, 641, Dkt. 13-5 at 153-56, 482-83, 509-14, 546-608, 679, 1402-03.

The evidence presented to the jury showed G.H. was attacked in her kitchen and dragged to her bedroom. Her hands were tied behind her back and she was raped twice before she died. Additionally, G.H.'s throat was slit three times, she was stabbed in the back three times, and evidence showed she struggled during the attack. Thus, evidence was presented to the jury showing Petitioner inflicted multiple blows, including multiple blows to G.H.'s back, and the

attack occurred over a period of time as G.H. was stabbed the kitchen and dragged to her

bedroom, where she was bound, raped, and stabbed several more times. The record, therefore,

supports the state supreme court's finding that there was sufficient evidence to show

premeditation. *See Garner v. Fraker*, 2010 WL 5124700, at *12 (E.D. Wash. Nov. 22, 2010)

("The infliction of multiple blows is strong evidence of premeditation."); *State v. Allen*, 159

Wash. 2d 1, 8 (2006) (noting "injuries inflicted by various means over a period of time can

support a finding of premeditation" and that "[s]ufficient evidence of premeditation may also be

found where the weapon used was not readily available, where multiple wounds are inflicted, or

where the victim was struck from behind").

Petitioner fails to demonstrate the state court's conclusion that there was sufficient

evidence for the jury to determine that Petitioner's murder of G.H. was premeditated was

contrary to, or an unreasonable application of, clearly established federal law, or was an

unreasonable determination of the facts in light of the evidence presented at trial. Accordingly,

Ground 3 should be denied.

E. Fourth Amendment Violation (Ground 4)

In Ground 4, Petitioner alleges his Fourth Amendment rights were violated related to a

warrant used to search and seize Petitioner's car and a knife and court orders used to obtain his

blood. Dkt. 3 at 22. He states the warrants and court orders were based on falsehoods told by an

employee of the police. *Id*.[1]

---

[1] Petitioner also references *Brady v. Maryland*, 373 U.S. 83 (1963) and *Strickland v. Washington*, 466 U.S. 668 (1984) in Ground 4. *See* Dkt. 3 at 22-23. However, in his supporting facts statement, Petitioner states he was never given an opportunity for a full and fair hearing of the Fourth Amendment issues and Petitioner's counsel did not include argument related to *Brady* or *Strickland* in the Traverse. *See* Dkts. 3, 29. Therefore, the Court finds Petitioner has only raised a Fourth Amendment claim in Ground 4.

1    "The Fourth Amendment assures the 'right of the people to be secure in their persons,

2    houses, papers, and effects against unreasonable searches and seizures.'" *Stone v. Powell*, 428

3    U.S. 465, 482 (1976). Courts will exclude evidence in order to effectuate these rights. *Id.*

4    However, the exclusionary rule itself is not a personal constitutional right. *Id.* at 486. The rule is

5    a judicially created remedial device designed to deter Fourth Amendment violations by law

6    enforcement personnel rather than "to redress the injury to the privacy of the victim of the search

7    or seizure, for any '[r]eparation comes too late.'" *Id.* at 486 (quoting *Linkletter v. Walker*, 381

8    U.S. 618, 637 (1965)). Because of this, the Supreme Court held that "where the State has

9    provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner

10   may not be granted federal habeas corpus relief on the ground that evidence obtained in an

11   unconstitutional search or seizure was introduced at his trial." *Powell*, 428 U.S. at 494; *see also*

12   *Moormann v. Schriro*, 426 F.3d 1044, 1053 (9th Cir. 2005).

13         The federal court's inquiry is whether the petitioner had the opportunity to litigate his

14   claim, not whether he did or even whether the claim was correctly decided. *Ortiz–Sandoval v.*

15   *Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (citing *Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir.

16   1990)); *Locks v. Sumner*, 703 F.2d 403, 408 (9th Cir. 1983). To obtain relief, a petitioner must

17   demonstrate the state courts have not afforded him a full and fair opportunity to litigate his

18   Fourth Amendment claims. *Woolery v. Arave*, 8 F.3d 1325, 1328 (9th Cir.1993). If a state

19   provides the processes whereby a defendant can obtain full and fair litigation of a Fourth

20   Amendment claim, then the petition will be denied whether or not the defendant employs those

21   processes. *See Gordon*, 895 F.2d at 613–14 (holding that the determinative factor for the court

22   was that California law allowed for motion to suppress evidence, not whether defendant litigated

23   upon such grounds).

24

1    Here, Petitioner had an opportunity to litigate his unlawful search and seizure claims in

2    the state court. "The Washington Criminal Rules for Superior Court provide for a full and fair

3    opportunity to litigate Fourth Amendment claims." *See Hunter v. Miller-Stout*, 2013 WL

4    1966168, at *14 (W.D. Wash. Apr. 23, 2013), *report and recommendation adopted*, 2013 WL

5    1964928 (W.D. Wash. May 10, 2013); *see also* Washington State Criminal Procedure Rule CrR

6    3.6. Furthermore, Petitioner had an opportunity to raise the Fourth Amendment claims on direct

7    appeal or in a PRP. Indeed, Petitioner raised Ground 4 on direct appeal. *See* Dkt. 13-1 (Exhibit

8    6). In considering Petitioner's Fourth Amendment claim, the state supreme court made extensive

9    findings and determined Petitioner's rights had not been violated. *Gregory*, 158 Wash.2d at 820-

10   29; *see also* Dkt. 13-1 (Exhibit 3).

11   As Petitioner had the opportunity to pursue and, in fact, pursued the unlawful search and

12   seizures claims, Ground 4 is not cognizable under § 2254. *See Tisnado v. United States*, 547 F.2d

13   452, 456 (9th Cir. 1976) ("a federal court may not grant either § 2254 or § 2255 habeas corpus

14   relief on the basis that evidence obtained in an unconstitutional search or seizure was introduced,

15   respectively, at a state or federal trial where the defendant was provided an opportunity to litigate

16   fully and fairly his fourth amendment claim before petitioning the federal court for collateral

17   relief").

18   Petitioner contends he became aware of new evidence regarding the veracity of the

19   informant upon which the probable causes statements were based after his direct appeal. *See*

20   Dkts. 3, 29. Petitioner asserts the trial court expressly refused to resolve his claim, wherein he

21   requested a *Franks* hearing. Dkt. 29.[2] Petitioner, however, had the opportunity to litigate his

22

23   [2] A *Franks* hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154, (1978), is "an evidentiary hearing on
     the validity of the affidavit underlying a search warrant." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir.

24   2000). A defendant is entitled to a *Franks* hearing "if he 'can make a substantial preliminary showing that (1) the

1   Fourth Amendment claim on direct appeal. And, after he allegedly discovered new evidence,

2   Petitioner was able to raise the new claim before the trial court and the state supreme court. The

3   state court merely declined to relitigate Petitioner's Fourth Amendment claims.

4          Petitioner contends that the state court erred because the trial court held that it could not

5   rule the blood draw orders invalid when the state supreme court had already upheld their validity.

6   *See* Dkt. 29 at 8; *see also* Dkt. 29-2 at 3. Petitioner fails to recognize that the trial court rejected

7   Petitioner's assertion that he did not discover, until recently, the fact that the informant had a

8   history of being a police informant in drug investigations. The trial court also found the State did

9   not withhold any evidence or any material fact that could have affected the issuance of the order

10  for a DNA sample. Dkt. 29 at 8; Dkt. 29-1 at 3.

11         The state supreme court further summarized the facts, finding:

12         Gregory argues that the trial court should have suppressed certain key evidence
           used at trial (blood samples, DNA, a knife) and should have granted his motion for
13         a new trial. In Gregory's first appeal before this court, we upheld the validity of the
           blood samples and DNA evidence but reversed his rape conviction on other grounds
14         and remanded the case for resentencing. *Gregory* I, 158 Wash.2d at 828-29, 867,
           147 P.3d 1201. In June 2011, following remand, Gregory brought a pretrial motion
15         that again challenged the admissibility of the DNA evidence. Gregory moved to
           dismiss his death penalty proceeding and to order a new guilt phase trial. Gregory
16         also moved to suppress evidence used to obtain his first degree murder conviction
           or, in the alternative, to order a *Franks* hearing to determine the State's knowledge
17         regarding potentially exculpatory evidence used as a basis to find probable cause
           for the warrant and orders in question. Gregory argued that despite our holding in
18         *Gregory* I, law of the case did not bar his challenge. He also argued that the State
           had in its control *Brady* information concerning R.S. that evidenced its lack of
19         probable cause to prosecute Gregory for rape. The trial court ruled the information
           regarding R.S. was not *Brady* material and was not withheld by the prosecution.
20         Regarding the DNA and blood samples, the trial court denied Gregory's motions

21

22  affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot
    support a finding of probable cause without the allegedly false information'; i.e., the challenged statements or
    omissions are material." *United States v. Kleinman*, 880 F.3d 1020, 1038 (9th Cir. 2017) (quoting *Reeves*, 210 F.3d
23  at 1044). "If both requirements are met, the search warrant must be voided and the fruits of the search excluded."
    *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (cleaned up).

24

REPORT AND RECOMMENDATION - 23

because this court had "thoroughly analyzed and decided" those issues in *Gregory* I. 5 Verbatim Report of Proceedings (June 24, 2011) (VRP) at 284. Gregory filed a motion to reconsider, but the trial court denied the motion.

> Gregory now attempts to reassert many of the same arguments from his first appeal. He claims the State withheld relevant information about R.S. when obtaining the orders to procure a sample of his DNA and a warrant to search his vehicle where the knife was found. Specifically, he asserts that the trial court would not have authorized the warrant or the orders if it was aware that R.S. had a history as a paid confidential informant.

*State v. Gregory*, 192 Wash. 2d 1, 28–29, 427 P.3d 621, 638 (2018) (footnotes omitted)

("*Gregory* II"). The state supreme court also found,

> The primary justification Gregory asserts for revisiting this issue is the information surrounding R.S.'s history as a confidential informant. However, the trial court found that this information was either known or made available to Gregory's attorney prior to the first trial. Gregory does not challenge this finding on appeal. Thus, Gregory failed to timely raise the issue in the trial court either prior to or during his first appeal. *See State v. Robinson*, 171 Wash.2d 292, 304, 253 P.3d 84 (2011) (explaining that the general rule is that a failure to raise an issue before the trial court constitutes a waiver, unless the party can show a manifest error affecting a constitutional right).

*Id.* at 30.

The state supreme court declined to review Petitioner's additional arguments related to the Fourth Amendment claims and the request for a *Franks* hearing because the court had already determined the legal issue in a prior appeal. *Id.* at 28. The court also noted that review was not warranted under RAP 2.5(c)(2) and that Petitioner had not shown grounds for overruling state supreme court precedent. *Id.* at 28-34. Petitioner was also able to raise this ground again in his PRP. *See Matter of Gregory*, 17 Wash.App.2d 1078.

Petitioner's argument that the state court did not fully and fairly consider his Fourth Amendment claim is unfounded. The state court considered his claim on direct appeal. Then, after the direct appeal and after Petitioner alleged he had newly discovered evidence, the state court again considered his Fourth Amendment claim. The state court disagreed with Petitioner

and found Petitioner had not shown there was new evidence. Petitioner did not challenge that ruling. Despite Petitioner's contention, the record reflects Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim. Therefore, Ground 4 is not cognizable under § 2254 and Petitioner is not entitled to habeas relief on this ground. Accordingly, Ground 4 of the Petition should be denied.

## F.   Use of Stun Belt (Ground 5)

Petitioner alleges the use of a stun belt during trial violated his due process rights and right to a fair trial. Dkt. 3 at 26.

A criminal defendant has a constitutional right to be free of visible restraints in the presence of the jury absent an essential state interest that justifies the physical restraints. *Deck v. Missouri*, 544 U.S. 622, 629 (2005), *Rhoden v. Rowland,* 172 F.3d 633, 636 (9th Cir. 1999). For a defendant to prevail on a claim of this nature, a court must find the defendant was physically restrained in the presence of the jury, the shackling was seen by the jury, and the physical restraint was not justified by state interests. If a constitutional error is found, the court next must ask whether the error had a "substantial and injurious effect" on the jury's verdict. *Castillo v. Stainer,* 997 F.2d 669, 669 (9th Cir.1993).

In setting forth the factual findings related to the use of the stun belt, the state court of appeals stated:

> During pretrial proceedings in the aggravated murder case, Gregory was placed in a stun belt for security reasons. The trial court held a hearing and found good cause to order Gregory to wear a stun belt.
>
> At the beginning of the aggravated murder trial, Gregory asked the court to reconsider the prior ruling regarding the stun belt. The trial court reviewed the pleadings submitted by the parties and held a hearing regarding the application of the stun belt. The court made extensive findings of fact, including consideration of an escape attempt, Gregory's rape conviction and sentence, the existence of several *Hartzog*[1] factors, the discreetness of the stun belt, and alternatives to the use of a

stun belt. The court concluded that the stun belt was the least restrictive means possible to ensure the safety of all persons in the courtroom while ensuring that Gregory would have a fair trial by giving him the appearance of being free from restraint. As a result, the court denied Gregory's motion for reconsideration.

Dkt. 13-3 at 138 (fn.1 states "*State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981)");

*Matter of Gregory*, 17 Wash. App. 2d 1078 (2021).

The state court of appeals then found Petitioner's claim to be meritless, ruling:

Gregory argues that his due process rights and right to a fair jury trial were violated when he was forced to wear a stun belt during his murder trial. We disagree.

1. Due Process

A criminal defendant is entitled to appear at trial free from all restraints except in extraordinary circumstances. *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). As such, "restraining devices should 'be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.'" *State v. Damon*, 144 Wn.2d 686, 691, 25 P.3d 418 (2001).

"Although restraints implicate important constitutional rights, the right to be free from restraint is not absolute, and trial court judges are vested with the discretion to determine measures that implicate courtroom security, including whether to restrain a defendant in some capacity in order to prevent injury." *Jackson*, 195 Wn.2d at 852. Trial courts have "broad discretion to determine what security measures are necessary to maintain decorum in the courtroom and to protect the safety of its occupants. *Damon*, 144 Wn.2d at 691. But there must be a factual basis in the record for the exercise of that discretion. *Jackson*, 195 Wn.2d at 853.

In exercising its discretion whether to allow the defendant to be restrained, the trial court may consider several factors including:

"[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Id.* (alteration in original) (internal quotation marks omitted) (quoting *State v. Hutchison*, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998)). Before deciding if a

defendant should be restrained, the trial court must conduct a hearing and enter findings that reflect a reasoned analysis that justifies the use of the restraints. *Damon*, 144 Wn.2d at 691-92. Failure to make an adequate inquiry on the record constitutes constitutional error. *State v. Clark*, 143 Wn.2d 731, 775, 24 P.3d 1006 (2001).

A claim of unconstitutional use of a restraint is subject to harmless error analysis. *See Jackson*, 195 Wn.2d at 855. Under that analysis, the State bears the burden to show beyond a reasonable doubt that the use of the restraint was harmless. *Id.* at 856.

   2. Analysis

At two different hearings in 1999 and 2001, the trial court addressed whether the use of restraints on Gregory were necessary during the proceedings of the case. Significant here, the detailed 2001 findings of fact and conclusions of law show that the court considered Gregory's past attempt to escape from jail, the location and security of the courtroom with respect to any potential escape attempts during trial, alternatives to the use of a stun belt, the existence of any *Hartzog* factors, and lack of visibility of a stun belt under Gregory's clothes. The court also balanced Gregory's right to a fair trial and the court's authority to "maintain decorum in the courtroom and to protect the safety of its occupants." *See Damon*, 144 Wn.2d at 691.

After the 2001 hearing, the trial court issued detailed findings of fact and conclusions of law, citing additional events that occurred in between the two hearings that further justified the use of restraints:

   3. Based on police reports and information provided by the State, the defendant attempted to escape from the Pierce County Jail on July 31, 2000. The defendant removed the screws from the frame around his window and cracked the window itself. The defendant is charged with Attempted Escape 2 and Malicious Mischief 2 from this incident.

   4. In October 2000, the defendant was convicted of three counts of Rape in the First Degree with deadly weapon sentence enhancement. In November, 2000, the defendant was sentenced to 331 months in prison. Regardless of the outcome of this case, the defendant will be taken to the Department of Corrections when this trial is over.

   5. The defendant has had several other incidents involving his refusal to comply with the rules of the jail and/or commands from jail staff. Those incidents are listed in the State's memorandum, with specific documentation contained in the appendices of that memorandum. That list of incidents is incorporated herein by this reference.

Clerk's Papers (CP) at 6116-17.

The trial court made additional findings that recognized several *Hartzog* factors and additional factors that it considered:

> 6. Many of the Hartzog factors are present in this case, including: 1) the defendant is charged with the most serious offense possible; 2) the defendant is only 28 years old, is over six feet tall, and appears to be in good physical condition; 3) the defendant has been convicted of a violent sex offense, three counts; 4) the defendant attempted to escape from the jail; 5) the escape attempt suggests that the defendant might try to escape again; 6) the courtroom in which this case will be tried is the furthest courtroom to respond to in case of an emergency and is quite close to an exit from the building; and 7) there is no adequate alternative remedy; the other options the court has available are belly chain and handcuffs, which would clearly be visible to the jury, or no physical restraints and additional security guards, which would likely cause the jury to speculate why so many officers were present.
>
> 7. There are additional factors that the court has considered, including: 1) the defendant has already been sentenced to over 28 years in prison and will be taken to prison regardless of the outcome of this trial, so the incentive to attempt an escape is greater now [than] before the defendant was convicted and sentenced in that case; 2) the stun belt apparatus is not visible to the casual observer because a) it will be covered by the defendant's suit coat and b) the design of the chairs in the courtroom is such that the defendant can sit normally in the chair, completely hiding the stun belt equipment.
>
> 8. If the court were to find the stun belt should not be worn, there would have to be additional uniformed jail guards present. This alternative could impact the defendant's right to a fair trial because it might suggest to the jury that the defendant is so dangerous that several officers have to be present to protect persons from him.

CP at 6117-18.

All these findings of fact were supported by a number of attachments to the State's memorandum in support of the use of a stun belt during trial. Based on the findings, the trial court concluded that the stun belt, in comparison to physical restraints or no restraints of any kind but additional security guards, would allow Gregory to appear free of restraints while balancing the safety and security of the courtroom.

Gregory challenges a number of the trial court's findings. First, he argues that he was not a flight risk because there was no real danger of escape when he attempted to pry a window open. But the record shows that Gregory actually removed the screws from the frame around his window and successfully cracked open the window. This was a sufficient basis to find that he was a flight risk, especially in

light of the finding that Gregory had been sentenced to over 28 years in prison for the then-valid rape conviction and would be taken to prison regardless of the outcome of the aggravated murder trial.

Second, Gregory argues that consideration of his rape conviction was not valid because that conviction later was reversed. But the trial court could not have known that the rape conviction would be reversed five years after it ordered the use of the stun belt.

Third, Gregory argues that the trial court's findings regarding his size, age, and physical shape may have been based on explicit or implicit racial bias. But he fails to provide any support for such an allegation. And age and physical attributes clearly are permissible factors to consider when determining if a defendant needs to be restrained. *Jackson*, 195 Wn.2d at 853.

Fourth, Gregory disputes the trial court's finding that the stun belt apparatus would not be visible to the jury based on the fact that it was covered by his clothes and the design of the chairs in the courtroom. He cites to defense counsel's comment on the record that eight potential jurors in the gallery section could see where Gregory was seated and the bulge in his back. However, the State clarified that the corrections officer confirmed that the stun device was not visible from the gallery because it was below the back of the chair where Gregory was sitting that morning. And defense counsel did not object after the trial court stated on the first day of trial that the stun belt was not visible to the jury while Gregory was seated.

Even if there was a factual dispute, the trial court was in a unique position to determine the visibility of the stun belt apparatus in its own courtroom. Further, the court stated that it would continue to monitor the use of the stun belt during the course of the trial to ensure that it remained hidden from the jury.

Finally, Gregory argues that the psychological effects of the stun belt further compounded the alleged racial bias in the jury because it caused him to appear stiff and emotionless. But he fails to point to any evidence in the record to support this allegation and the declaration that Gregory provides from his trial counsel only makes conclusory statements that the jurors may have speculated that Gregory was restrained during trial and made him look emotionless.

The trial court fully analyzed on the record whether to allow a stun belt to be applied to Gregory as required and considered many of the factors identified in *Jackson*. We conclude that substantial evidence in the record supports the trial court's findings of fact and conclusions of law. Further, we conclude that the trial court did not abuse its discretion in allowing a stun belt to be applied to Gregory during his trial. As a result, we hold that use of the stun belt did not violate Gregory's constitutional rights.

Dkt. 13-3 at 148-52 (footnote omitted); *Matter of Gregory*, 17 Wash. App. 2d 1078.

REPORT AND RECOMMENDATION - 29

1   A criminal defendant must show four things to establish that restraints ordered at trial

2   violate the due process clause: (1) defendant was physically restrained in the presence of the

3   jury; (2) the jury saw the restraint; (3) the restraint was not justified by state interests; and (4)

4   defendant was prejudice by the restraint. *U.S. v. Casares*, 788 F.3d 956, 966 (9th Cir. 2015)

5   (citation omitted); *see also Cox v. Ayers*, 613 F.3d 883, 890 (9th Cir. 2010).

6   Here, Petitioner appears to only challenge that the restraints were visible to the jurors. *See*

7   Dkt. 3 at 26. He states that defense counsel noted spectators and jurors could see he was wearing

8   some restraint under his clothing and that Petitioner appeared to be stiff and uncomfortable

9   during the trial because he was afraid of being shocked. *Id*. As the state court of appeals found,

10  which Petitioner does not contest, the stun belt was under Petitioner's suit jacket and a

11  corrections officer confirmed that the stun device was not visible from the gallery. Further,

12  Petitioner's counsel did not object after the trial court stated on the first day of trial that the stun

13  belt was not visible to the jury while Petitioner was sitting and, as the state court of appeals

14  noted, the trial court was in a unique position to determine the visibility of the stun belt. For

15  these reasons, Petitioner has not shown the state court's finding that the stun belt was not visible

16  to the jury was erroneous.

17  Petitioner does not challenge the state court of appeal's finding that the stun belt was

18  justified by state interests, nor has he shown, beyond a conclusory statement that his trial counsel

19  thought he appeared emotionless, that he was prejudiced. *See* Dkt. 3 at 26. *See Rook v. Holbrook*,

20  2019 WL 7606077, at *20 (W.D. Wash. Oct. 16, 2019) (finding no due process or fair trial rights

21  violated where a Band It restraint was worn during trial but not visible to the jury). Moreover,

22  the Court notes that, as the stun belt was not visible to the jury, the restraints did not prejudice

23  Petitioner's right to a fair trial. *See Williams v. Woodford*, 384 F.3d 567, 592 (9th Cir. 2004)

24

1  ("When the jury never saw the defendant's shackles in the courtroom, we have held that the

2  shackles did not prejudice the defendant's right to a fair trial.).

3       For the above stated reasons, Petitioner fails to demonstrate the state court's conclusion

4  that Petitioner's due process and fair trial rights were not violated when Petitioner was restrained

5  with a stun belt during trial was contrary to, or an unreasonable application of, clearly established

6  federal law. Accordingly, Ground 5 of the Petition should be denied.

7      G.  Jury Bias (Ground 6)

8       In Ground 6, Petitioner asserts his conviction rests on a verdict from a jury that was

9  infected by racial bias in violation of the Sixth and Fourteenth Amendments. Dkt. 3 at 26-27.

10  Petitioner states that his death sentence was vacated, in part, due to a pattern of racial bias by

11  capital juries. *Id*. Petitioner states his case was impacted by an explicit or implicit bias. *Id*. The

12  jury was all white and Petitioner was black. *Id*.

13       The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel

14  of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "The bias or

15  prejudice of even a single juror would violate [a defendant's] right to a fair trial." *Dyer v.*

16  *Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). "Due process means a jury capable and willing to

17  decide the case solely on the evidence before it, and a trial judge ever watchful to prevent

18  prejudicial occurrences and to determine the effect of such occurrences when they happen."

19  *Smith v. Phillips*, 455 U.S. 209, 217 (1982). To succeed on an impartial juror claim, "a defendant

20  usually bears the burden of demonstrating that the challenged juror was biased[.]" *United States*

21  *v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009).

22       The state court of appeals considered Petitioner's assertion that he was denied an impartial

23  jury. *See* Dkt. 13-3 at 153-56. The state court found:

24

Gregory argues that his conviction must be vacated because it rests upon a verdict from a jury that was infected by racial bias in violation of the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 21 and 22 of the Washington Constitution. He argues that the Supreme Court in *Gregory* II already determined that the jury in his case likely was infected by explicit or implicit racial bias. We disagree.

1. Legal Principles

Under the Sixth and Fourteenth Amendments of the United States Constitution, a criminal defendant has the right to be tried by a jury that is "representative of the community." *State v. Barajas*, 143 Wn. App. 24, 34, 177 P.3d 106 (2007). However, there is "no constitutional right to a jury comprised in whole, or in part, of persons of his or her own race." *Id.* But there is a constitutional right to " 'be tried by a jury whose members are selected pursuant to non-discriminatory criteria.' " *Id.* (quoting *Batson v. Kentucky*, 476 U.S. 79, 85-86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)).

The Supreme Court in *State v. Behre* expressed concern regarding racial bias within juries:

> Unlike isolated incidents of juror misbehavior, racial bias is a common and pervasive evil that causes systemic harm to the administration of justice. Also unlike other types of juror misconduct, racial bias is uniquely difficult to identify. Due to social pressures, many who consciously hold racially biased views are unlikely to admit to doing so. Meanwhile, implicit racial bias exists at the unconscious level, where it can influence our decisions without our awareness.
>
> ....
>
> An "impartial jury" means "an unbiased and unprejudiced jury," and allowing bias or prejudice by even one juror to be a factor in the verdict violates a defendant's constitutional rights and undermines the public's faith in the fairness of our judicial system.

193 Wn.2d 647, 657-58, 444 P.3d 1172 (2019) (quoting *Alexson v. Pierce County*, 186 Wash. 188, 193, 57 P.2d 318 (1936)).

2. Analysis

Gregory acknowledges that he does not provide any evidence to support his allegations that his jury evidenced explicit or implicit racial bias when he was convicted of aggravated murder. Nor does he make a *Batson* challenge arguing that the jury was selected in a discriminatory manner. Instead, he asks this court to apply the holding in *Gregory* II regarding racial bias in capital murder juries to this case. He claims that "there is now a definitive determination from the Washington

1

2

Supreme Court that capital juries in Washington State from 1981 until 2014 were
plagued by racial bias." Br. of Pet'r at 34.

3

However, the Beckett reports referenced in *Gregory* II provided data and analysis
regarding how race influences the *imposition of the death penalty*, not how race
impacts a jury's deliberation on whether a Black defendant is guilty of aggravated
murder. *See Gregory* II, 192 Wn.2d at 12. And the Supreme Court in *Gregory* II did
not make the determination that capital murder juries in general or this specific jury
was infected with racial bias. Instead, the court's holding was limited to an
assessment of the "association between race and the death penalty" and to "[t]he
arbitrary and race based imposition of the death penalty." *Gregory* II, 192 Wn.2d at
22-23. In the absence of the type of data compiled regarding the imposition of the
death penalty, we cannot agree with Gregory's suggestion that a jury that was racially
biased in assessing the death penalty necessarily would be racially biased in
convicting a defendant. We conclude that the Supreme Court's holding in *Gregory*
II does not support a finding that the jurors were affected by racial bias during the
conviction phase of the trial.

4

5

6

7

8

9

10

Gregory notes the fact that he was convicted by an all-white jury selected from a jury
pool that included only two Black potential jurors, even though Pierce County's
population at the time was eight percent Black. One of the Black prospective jurors
was excused because of hardship and the other was stricken for cause because of
opposition to the death penalty. But he acknowledges that these facts are not
sufficient to grant him relief. *See Yates*, 177 Wn.2d at 20-21 (rejecting a claim that
the jury pool was not from a fair cross section of the community without statistical
evidence that certain groups have been underrepresented in jury pools).

11

12

13

14

Gregory also notes the use of antiquated racial terms like "Negroid" and "Negro"
during expert testimony regarding DNA evidence. But he acknowledges that use of
such words is not necessarily proof of improper racial bias. *See In re Pers. Restraint
of Gentry*, 179 Wn.2d 614, 634, 316 P.3d 1020 (2014) (stating that "[t]he
prosecution's use of the word [Negroid] does not in any way appear to be an appeal
to race-based prejudices, and we reject the claim that it was improper").

15

16

17

18

Gregory cites *Berhe* to highlight the prevalence of racial bias in juries. In that case, a
juror informed defense counsel and the trial court after conviction that she wanted to
vote "not guilty" but that the other jurors ignored her concerns because she was the
only juror who was the same race as the defendant. *Berhe*, 193 Wn.2d at 651, 54. The
defendant moved for a new trial and requested an evidentiary hearing based on this
information. *Id.* at 653. The Supreme Court held that the trial court failed to conduct
a sufficient inquiry into the allegations of racial bias that influenced the jury verdict
and vacated the trial court's order denying the defendant's motion for a new trial. *Id.*
at 669-70. But *Berhe* is inapplicable here because Gregory concedes that there is no
evidence that any juror exhibited implicit or explicit racial bias in this case.

19

20

21

22

23

24

REPORT AND RECOMMENDATION - 33

Gregory has presented no actual evidence that the jury was infected by racial bias when it convicted him of first degree aggravated murder. Therefore, we reject Gregory's racial bias claim.

*Id.*; *Matter of Gregory*, 17 Wash. App. 2d 1078.

Petitioner has failed to cite to any evidence showing the jury pool or the impaneled jury exhibited any racial bias or prejudice toward Petitioner. Petitioner's conclusory allegations that the jury was racially biased during the conviction stage of his trial simply because the state supreme court found racial bias specific to the death sentencing phase is insufficient to warrant habeas relief. Petitioner has not shown Sixth Amendment right to a fair trial by a panel of impartial, indifferent jurors was violated. Moreover, Petitioner has not shown, nor does the Court find, Petitioner's claim of racial bias rests upon clearly established Supreme Court law. Petitioner fails to demonstrate the state court's conclusion that Petitioner's right to a fair trial was not violated by was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Ground 6 of the Petition should be denied.

H.  Prosecutorial Misconduct and Ineffective Appellate Counsel (Ground 7)

Petitioner contends the State engaged in prosecutorial misconduct when the prosecutor presented false and misleading statements during closing arguments. Dkt. 3 at 27-28. Specifically, Petitioner asserts the prosecutors "exhorted the jury to 'declare the truth,' which they claimed was the same as 'doing justice.'" *Id*. at 28.[3] Petitioner also contends the prosecutors attacked the integrity of Petitioner's trial counsel for challenging a state witness, asked why the defense did not call a witness, and misrepresented the statistical probability of the DNA results.

---

[3] In his supporting facts statement, Petitioner stated that the prosecutors noted Petitioner could be in the courtroom, but G.H. could not, and argued the "community" should decide if G.H. deserved justice. Dkt. 3 at 28. Based on the record and Petitioner's failure to further develop these arguments in his Traverse, the Court finds these statements are an expansion of his claims that the prosecutors erred in directing the jurors to "declare the truth" and "doing justice."

1    *Id*. Petitioner also asserts his appellate counsel was ineffective for failing to challenge the State's

2    use of the statement "declare the truth" on appeal. *Id.*

3          In determining if a prosecutor's conduct rises to the level of prosecutorial misconduct, the

4    relevant inquiry is whether the prosecutor's conduct "so infected the trial with unfairness as to

5    make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168,

6    181 (1986); *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (*Darden* standard is

7    "clearly established Federal law" for purposes of 28 U.S.C. § 2254(d)). A trial error is presumed

8    to be harmless unless the error had "substantial or injurious effect or influence in determining the

9    jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). It is the petitioner's burden to

10   state facts that point to a real possibility of constitutional error in this regard. *See O'Bremski v.*

11   *Maass*, 915 F.2d 418, 420 (9th Cir. 1990).

12         To determine if a due process violation occurred, the court "must consider the probable

13   effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United*

14   *States v. Young*, 470 U.S. 1, 12 (1985). To do so, the prosecutor's remarks must be viewed in

15   context. *See Boyde v. California,* 494 U.S. 370, 385 (1990); *United States v. Robinson,* 485 U.S.

16   25, 33–34 (1988); *Williams v. Borg,* 139 F.3d 737, 745 (9th Cir.1998). The Court may consider

17   whether the prosecutor's comments manipulated or misstated the evidence, whether the trial

18   court gave a curative instruction, and the weight of the evidence against the accused. *Darden*,

19   477 U.S. at 181–82.

20         i.   *"Declare the truth" statements*

21         Petitioner raised his prosecutorial misconduct claim related the prosecutors' comments to

22   "declare the truth" in his PRP. *See* Dkt. 13-3 at 156-60. The state court of appeals discussed the

23

24

1    standard of review and the reviewability of the claim. *See id*. at 156-57. In discussing the

2    statements and its analysis, the state court of appeals ruled:

3        Gregory argues that the State's "declare the truth" arguments during opening
         statement and closing arguments constituted prosecutorial misconduct. We agree
4        that the arguments were improper, but we conclude that Gregory waived this claim
         when he did not object at trial.
5
         . . . .
6
                                a. Challenged Statements
7
8    Here, one of the prosecutors stated in her opening statement:

9        We ask a lot of juries in this system. We ask a lot of juries. What we ask you
         for is to listen to the evidence and to render a verdict. And the word "verdict"
10       that we use in American courts comes from Latin, veredictum, and it means
         declare the truth, declare the truth.
11
         You listen to the evidence in this case and declare the truth. It's the defendant,
12       Allen Gregory, who decided to rob [GH], who decided to rape her, and he
         decided to murder her. Declare the truth, ladies and gentlemen. Convict the
13       defendant.

14   RP (Feb. 14, 2001) at 4076. Gregory did not object.

15   A different prosecutor continued with the "declare the truth" theme in his closing
     argument:
16
         In opening statement, Ms. Robnett told you that the only purpose that you
17       have as jurors in a criminal case is to declare the truth, and it's with that
         purpose in mind that closing arguments proceed. Closing argument is the time
18       when you take the evidence that you were presented on the witness stand and
         fit it into the instructions that the court just read to you. The purpose of
19       closing argument is to point you toward a just verdict, declaring the truth,
         doing justice, two ways of saying the same thing. That's the only thing that
20       the state is interested in in this case.

21   RP (Mar. 19, 2001) at 6700. He again repeated "declare the truth" comments in
     rebuttal. Gregory did not object to either argument.
22
                                b. Improper Argument
23
     This court was the first appellate court in Washington to hold that "declare the
24   truth" arguments were improper in *State v. Anderson*, 153 Wn. App. 417, 429, 220

REPORT AND RECOMMENDATION - 36

P.3d 1273 (2009). The court stated, "A jury's job is not to 'solve' a case. It is not, as the State claims, to 'declare what happened on the day in question.... Rather, the jury's duty is to determine whether the State has proved its allegations against a defendant beyond a reasonable doubt." *Id.*

Another panel of this court subsequently held that a "speak the truth" argument was not misconduct. *State v. Curtiss*, 161 Wn. App. 673, 701-02, 250 P.3d 496 (2011). But in a later case this court again relied on *Anderson* in determining that such an argument was improper. *State v. Walker*, 164 Wn. App. 724, 733, 265 P.3d 191 (2011).

The Supreme Court subsequently confirmed that when the prosecutor tells the jury to "declare the truth," it is a misstatement of the burden of proof and constitutes improper conduct. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014); *Emery*, 174 Wn.2d at 760. The court in *Emery* stated, "The jury's job is not to determine the truth of what happened; a jury therefore does not 'speak the truth' or 'declare the truth.' " 174 Wn.2d at 760. Instead, "a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." *Id.*

Here, the State used nearly identical language that the Supreme Court twice has held was improper. *See Lindsay*, 180 Wn.2d at 430, 437; *Emery*, 174 Wn.2d at 751, 760. Therefore, we conclude that the prosecutor's statements were improper.

### c. Failure to Object

Because Gregory failed to object to the prosecutors' statements, the question here is whether he waived his challenge. *See Emery*, 174 Wn.2d at 760-61.

First, the prosecutors' statements were not necessarily flagrant and ill-intentioned. They certainly would be if made today. But *Anderson*, the first case holding that "declare the truth" arguments were improper, was decided over eight years after Gregory's murder trial. 153 Wn. App. 417. And even after *Anderson* this court issued contrary opinions on this issue. *Walker*, 161 Wn. App. at 733; *Curtiss*, 161 Wn. App. at 701-02. *Emery* was decided 11 years after Gregory's trial. 174 Wn.2d 741. Therefore, this was not a situation where the prosecutor was ignoring established precedent.

Second, the prosecutors' statements could have been cured by an instruction if Gregory had objected. The court in *Emery* held that an instruction could have cured a "declare the truth" argument and another argument misstating the State's burden of proof. 174 Wn.2d at 763-64. The court noted that these types of comments were not so inflammatory that they created incurable prejudice. *Id.* at 762-63. The court stated that the trial court "could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden. Such an instruction would have eliminated any possible confusion and cured any potential prejudice stemming from the prosecutor's improper remarks." *Id.* at 764.

REPORT AND RECOMMENDATION - 37

1

2       Accordingly, we hold that although the "declare the truth" statements were improper, Gregory waived his challenge to those statements.

3    Dkt. 13-3 at 158-60; *Matter of Gregory*, 17 Wash. App. 2d 1078.

4       As the state court found, the "declare the truth" statements by the prosecutor were not

5    flagrant and ill-intentioned. Moreover, the statements were not prejudicial that a curative

6    instruction—had an objection been made to the statements at trial—could not have eliminated any

7    resulting prejudice. *See Dillard v. Glebe*, 2014 WL 1910001, at *13 (W.D. Wash. May 12, 2014)

8    (finding a prosecutor's statements that the jury would "declare the truth" did not warrant habeas

9    relief when the statements were not flagrant or ill-intentioned and a curative instruction could have

10   cured any prejudice had there been an objection). As such, the "declare the truth" statements are

11   not sufficient to warrant habeas relief.

12       ii.    *Remaining prosecutorial misconduct claims*

13       Petitioner raised the remaining prosecutorial misconduct claims on direct appeal.[4] In

14   determining the prosecutor did not commit prosecutorial misconduct, the state supreme court

15   stated:

16       Gregory contends that during closing argument, the prosecutors committed misconduct by improperly denigrating defense counsel, arguing facts not in

17       evidence, and improperly shifting the burden to the defense. The defendant bears the burden of showing that the prosecutor's remarks were improper. *State v.*

18       *Stenson,* 132 Wash.2d 668, 718, 940 P.2d 1239 (1997), *cert. denied,* 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998). Even if the defendant does so, the error

19       does not require reversal unless "the appellate court determines there is a substantial likelihood the misconduct affected the jury's verdict." *Id.* at 718–19, 940 P.2d 1239.

20       A defendant's failure to object to a prosecutor's improper remark constitutes a waiver unless the remark was "so flagrant and ill-intentioned that it evinces an

21       enduring and resulting prejudice" that could not have been cured by an instruction to the jury. *Id.* at 719, 940 P.2d 1239; *see also Gentry,* 125 Wash.2d at 596, 888

22

23   ───────────────

         [4] Petitioner's remaining prosecutorial misconduct claims are that: (1) prosecutors improperly argued
24   Petitioner's trial counsel lacked integrity; (2) prosecutors improperly argued that the defense did not call a witness;
     and (3) prosecutors misrepresented the statistical probability of the DNA results. Dkt. 3.

P.2d 1105; *Hoffman,* 116 Wash.2d at 93, 804 P.2d 577. Where the defendant objects and requests a curative instruction or moves for a mistrial, we give deference to the trial court's ruling because it is in the best position to evaluate whether the prosecutor's comment prejudiced the defendant. *Stenson,* 132 Wash.2d at 719, 940 P.2d 1239. Allegedly improper comments must be viewed in the context of the entire argument, and a prosecutor enjoys wide latitude "in drawing and expressing reasonable inferences from the evidence." *Gentry,* 125 Wash.2d at 641, 888 P.2d 1105.

*Comments Regarding Cross–Examination of Dr. Brown:* Dr. Brown, formerly of the WSPCL, testified at Gregory's trial. In an earlier, unrelated case, Brown conducted an RFLP test and drafted a report for his co-worker to review. The co-worker noted a mistake, which Dr. Brown then corrected. When questioned during an interview with defense counsel in that case, Brown lied to cover up the mistake. During cross-examination here, Gregory's defense counsel focused, in part, on this incident and Brown's subsequent resignation.

In closing, the prosecutor remarked that the defense strategy in this case was "to attack the scientists personally." MRP at 6724. The prosecutor argued:

> John Brown is the perfect example of how the defense tactic in DNA cases has changed, because John Brown suffered an unbelievable attack personally. It wasn't professional. It was personal.

MRP at 6727. Defense counsel objected. The court sustained and ordered this argument to be stricken from the record. The prosecutor then argued:

> John Brown was questioned about every single thing except his work in this case. What does that tell you? Distract, deflect, divert, get your attention away from the work that John Brown did in this case so maybe you won't see how well it was done, so maybe you won't see how much it matches and how much the defendant committed this crime.

MRP at 6727. There was no objection to this argument.

Where the defense failed to object, we must determine whether the argument was so flagrant and ill-intentioned that it resulted in an enduring prejudice that could not be obviated by a curative instruction. *Stenson,* 132 Wash.2d at 719, 940 P.2d 1239. "[T]he prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *Russell,* 125 Wash.2d at 87, 882 P.2d 747. In *Russell,* this court evaluated a prosecutor's statement that the defense had "'attacked and vilified'" a DNA expert. *Id.* at 92, 882 P.2d 747 (quoting Verbatim Report on Appeal at 7289). The *Russell* prosecutor argued that defense counsel would " 'stoop to any level' " to call scientific evidence into question. *Id.* The *Russell* court found that the prosecutor's remarks "appear to have been provoked by defense counsel and arguably constitute a fair response to attacks made by the

defense on the deputy prosecutor, her witnesses, and the work of government agents." *Id.* at 93, 882 P.2d 747. The court held that "[w]hile inflammatory, the remarks were not so prejudicial that a curative instruction would have been ineffective." *Id.*

We conclude that the prosecutor's remarks in this case were no worse than the prosecutor's remarks in *Russell.* The trial court struck from the record the characterization of the attack on Brown as personal. Gregory has not shown that the trial court abused its discretion in crafting a remedy, especially where no further curative instruction was requested. The prosecutor's other remarks, arguing that the defense was trying to divert the jury's attention away from the DNA evidence, seem to be a fair response to defense counsel's cross-examination of Brown. While Gregory points to various other cases in which courts have found due process violations, those cases are distinguishable in that they involve characterizations of defense counsel as liars. *See* Appellant's Opening Br. at 139–40 (listing cases). Prosecutors in this case simply did not go so far.

Facts Not in Evidence: Gregory also argues that the prosecutor argued facts not in evidence and misstated the evidence presented to the jury. Specifically, he contends that the prosecutor improperly referred to the population of the United States and the world, the prosecutor improperly argued that the results of the three DNA tests could be combined to create a single probability of a random match, and the prosecutor improperly listed nonforensic uses for DNA testing. Notably, the defense did not object to any of the above challenged statements during closing argument. Therefore, we must determine only whether the prosecutor's comments were so flagrant and ill-intentioned that an enduring prejudice resulted such that a curative instruction could not have been effective. *Stenson,* 132 Wash.2d at 719, 940 P.2d 1239.

*Population Statistics:* During closing argument, the prosecutor referred to testimony that the chance of a random match between the defendant and the DNA left at the scene under the RFLP test was "1 in 325 million, roughly the population of the United States." MRP at 6729. The prosecutor also repeated that the chances of a random match between Gregory and the crime scene DNA under the STR test was "1 in 180 billion people," which amounted to "[r]oughly 30 times the population of the world." MRP at 6732. The State acknowledges that there was no evidence presented at trial as to the populations of the United States or the world, but in argument, the parties are granted wide latitude in drawing inferences from the evidence, and Gregory does not show that the argument was flagrant and ill-intentioned. *See Gentry,* 125 Wash.2d at 641, 888 P.2d 1105. The jury instruction explaining that the jury must not consider facts not in evidence would have cured any error. Therefore, these statements do not warrant reversal.

*Additional Application of the Product Rule:* During closing argument, the State combined the results of all three types of DNA testing by multiplying the results of each, using the product rule:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

> What are the odds of a person having the six locations that match between Allen Gregory and the vaginal swabs using DQ–Alpha, the six locations between the defendant and the bedspread sperm RFLP, and the nine locations on all of the evidence and the defendant using STRs, 1 in 2,500, times 1 in 325 million, times 1 in 180 billion. It's a 5–digit number with 19 zeroes after it. That's the chance. That's the odds of somebody else besides this defendant raped and murdered [G.H.].

MRP at 6733. Gregory now argues that there was no evidence that the product rule can properly be applied across results obtained from different DNA tests. However, the State is entitled to draw reasonable inferences from the evidence, and again, Gregory has not shown that the argument was flagrant or ill-intentioned. Finally, there was evidence that the odds of a random match were at least 1 in 180 billion. The odds were already so high as to virtually eliminate the chances of a random match such that this argument would not have prejudiced the defense.

Other Uses for DNA Evidence: Finally, Gregory argues that the prosecutor improperly referred to other high stakes uses of DNA testing. Specifically, the prosecutor noted that DNA testing has been used in medical diagnosis and transplant procedures and identification of casualties of war, victims of the Oklahoma City bombing, and victims of plane crashes. The prosecutor then emphasized the trustworthiness of DNA testing. While Gregory argues that this comment was not supported by evidence at trial, one of the scientists testified, without objection, that PCR and RFLP testing have been used in "medical research and diagnostic transplant, organ research, the identification of war dead, the identification of remains in the Oklahoma City bombing and plane crashes." MRP at 4714. Any minor departure from the actual testimony is not enough to warrant reversal here.

*Comment on the Missing Witness:* Gregory also asserts that the prosecutor improperly shifted the burden of proof by commenting that the defense failed to call Mike Barth, G.H.'s ex-boyfriend, whom the defense suggested had actually killed G.H. The prosecutor argued:

> Now the defense didn't call Mike Barth. They didn't call him and say, Did you kill her? The state didn't call him either. The state did one better. The state called in his biological evidence, confirmed it with the evidence at the murder scene, and there isn't any chance at all.

MRP at 6723. The "missing witness doctrine" allows a prosecutor to comment on the defendant's failure to call a witness in certain circumstances:

> Under this doctrine, where a party fails to call a witness to provide testimony that would properly be a part of the case and is within the control of the party in whose interest it would be natural to produce that testimony, and the party

REPORT AND RECOMMENDATION - 41

1

2

fails to do so, the jury may draw an inference that the testimony would be unfavorable to that party.

3

4

5

*Cheatam,* 150 Wash.2d at 652, 81 P.3d 830. However, this court has held that the missing witness doctrine is limited; "the inference is not available if the witness's testimony would necessarily be self-incriminatory if favorable to the party who could have called the witness." *State v. Blair,* 117 Wash.2d 479, 489–90, 816 P.2d 718 (1991). The missing witness doctrine would not apply here where, if Barth's testimony were favorable to Gregory, it would have incriminated Barth.

6

7

8

9

Even though the missing witness doctrine does not permit the argument in this case, Gregory has not shown how the prosecutor's comment was prejudicial. *See Blair,* 117 Wash.2d at 491, 816 P.2d 718. In fact, during closing argument, the prosecutor discussed the State's burden of proof. Defense counsel never requested a curative instruction, which could easily have reminded the jury of the proper burden of proof. The comment was not so flagrant and ill-intentioned that it would have resulted in enduring prejudice. *Stenson,* 132 Wash.2d at 718–19, 940 P.2d 1239. We conclude that none of the challenged closing arguments amount to misconduct.

10

Dkt. 13-1 at 50-53 (footnotes omitted); *Gregory*, 158 Wash. 2d at 840–46.

11

12

13

14

15

16

17

18

19

20

21

22

23

"Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000); *see also United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) ("prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence"), *as amended on denial of reh'g* (Apr. 15, 1993). "A prosecutor may not, however, base closing argument on evidence not in the record." *U.S. v. Sanchez-Soto*, 617 Fed. App'x. 695, 697 (9th Cir. 2015). Petitioner fails to assert that the prosecutors' comments in closing arguments were not based on evidence or on reasonable inferences made from the record. *See* Dkt. 3 at 27-28. Further, to the extent any argument was not based on reasonable inferences made from the record, Petitioner has not shown prejudice. Therefore, Petitioner has not shown these statements made in closing arguments warrant habeas relief.

24

1    In sum, Petitioner fails to show that any portion of the prosecutor's closing argument

2    rendered his trial fundamentally unfair. Therefore, Petitioner has not shown the state court

3    decisions that there was no prosecutorial misconduct during closing arguments was contrary to,

4    or an unreasonable application of, clearly established federal law.

5        iii.    *Ineffective assistance of appellate counsel*

6        In Ground 7, Petitioner also asserts his appellate counsel was ineffective for failing to

7    challenge the State's use of the statement "declare the truth" in its arguments. Claims of

8    ineffective assistance of counsel on appeal are reviewed under a deferential standard similar to

9    that established for trial counsel ineffectiveness in *Strickland v. Washington*, 466 U.S. 668

10   (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Smith v. Murray*, 477 U.S. 527, 535

11   (1986). Under this standard, a petitioner challenging his appellate counsel's performance must

12   demonstrate (1) counsel's performance was unreasonable, which in the appellate context requires

13   a showing counsel acted unreasonably in failing to discover and brief a meritorious issue, and (2)

14   there is a reasonable probability, but for counsel's failure to raise the issue, the petitioner would

15   have prevailed on his appeal. *Robbins*, 528 U.S. at 285–86; *see also Wildman v. Johnson*, 261

16   F.3d 832, 841–42 (9th Cir. 2001); *Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir. 1992), *cert.*

17   *denied*, 508 U.S. 920 (1993); *Miller v. Keeney*, 882 F.2d 1428, 1433–34 (9th Cir. 1989).

18       The presumption of reasonableness is even stronger for appellate counsel because they

19   have wider discretion than trial counsel in weeding out weaker issues; doing so is widely

20   recognized as one of the hallmarks of effective appellate assistance. *Miller*, 882 F.2d at 1434.

21   The exercise of professional judgment in framing appellate issues makes it difficult to

22   demonstrate counsel's omission of a particular argument was deficient performance. *Robbins*,

23   528 U.S. at 288. Habeas relief is unavailable on a claim of appellate-counsel ineffectiveness

24

1    unless the state court's denial of the claim "was so lacking in justification that there was an error

2    well understood and comprehended in existing law beyond any possibility for fair[-]minded

3    disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

4           In determining Petitioner's appellate counsel was not ineffective for failing to preserve a

5    specific prosecutorial misconduct claim on appeal, the state supreme court found Petitioner's

6    appellate counsel was not deficient, stating:

7           Gregory also argues in the alternative that it was ineffective assistance of appellate
             counsel not to challenge the State's use of the "declare the truth" arguments in his
8           first appeal. He submits a declaration from his appellate counsel that the failure to
             raise this challenge was not based on any tactical reason.
9
             To establish ineffective assistance of appellate counsel, a petitioner bears the burden
10          to show that (1) his appellate counsel's performance was deficient and (2) the
             deficient performance prejudiced the defendant. *In re Pers. Restraint of Salinas*, 189
11          Wn.2d 747, 759, 408 P.3d 344 (2018). The petitioner also must show that the legal
             issue that the appellate counsel did not raise had merit and that he or she actually was
12          prejudiced. *Id.* at 760.

13          Here, we hold above that Gregory waived his challenge to the "declare the truth"
             statements by not objecting at trial. Gregory cannot show that the result would have
14          been any different if the issue had been raised in the first appeal. Therefore, we hold
             that Gregory cannot establish ineffective assistance of appellate counsel on this
15          ground.

16   Dkt. 13-3 at 160-61; *Matter of Gregory*, 17 Wash. App. 2d 1078.

17          As the state court of appeals found, there was no prejudice where a curative instruction

18   could have cured any improper statement if Petitioner's trial counsel had objected. Therefore, there

19   was no error to assert on appeal that would have resulted in reversal. As such, there was not a

20   reasonable probability of a different result on appeal if counsel had raised a prosecutorial

21   misconduct claim and Petitioner has not shown his appellate counsel's decision to not raise this

22   ground on his direct appeal was ineffective. *See Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir.

23   2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective

24

1   assistance when appeal would not have provided grounds for reversal."). Petitioner has provided

2   no argument showing, nor does the Court find, the state court of appeals decision that appellate

3   counsel was not ineffective was contrary to, or an unreasonable application, of clearly established

4   federal law. *See* Dkt. 3 at 28.

5           For the above stated reasons, Ground 7 of the Petition should be denied.

6   I.   Right to Remain Silent (Grounds 8 & 9)

7           In Ground 8, Petitioner contends the prosecution violated his due process rights when the

8   state court admitted evidence that Petitioner refused to give a recorded statement to the police.

9   Dkt. 3 at 29. In Ground 9, Petitioner asserts the introduction of evidence showing Petitioner did

10  not contact detectives after detectives asked Petitioner's grandmother to have Petitioner contact

11  them violated his Fifth Amendment right to remain silent. *Id.*

12          In *Doyle v. Ohio*, the United States Supreme Court held that the right to remain silent

13  contains an implicit assurance that "silence will carry no penalty." 426 U.S. 610, 618 (1976). The

14  Court reasoned that "it would be fundamentally unfair and a deprivation of due process to allow

15  the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

16  *Id. Doyle* thus established that the government may not use a defendant's silence against him or

17  her as evidence of guilt. However, a defendant's pre-arrest or pre-*Miranda* silence may be used

18  for impeachment purposes without violating the federal constitution. *See Brecht v.. Abrahamson*,

19  507 U.S. 619, 628 (1993) (citations omitted). In addition, if a defendant gives a statement after

20  receiving *Miranda* warnings, and that statement is arguably inconsistent with his trial court

21  testimony, the prosecutor may inquire into the prior inconsistent statements during cross-

22  examination of the defendant. *See Anderson v. Charles*, 447 U.S. 404, 408-09 (1980). The court

23  of appeals has also stated that this rationale applies even when the defendant does not testify at

24

1    trial. *U.S. v. Hoac*, 990 F.2d 1099, 1104 (9th Cir. 1993); *Klepper v. United States*, 331 F.2d 694,

2    701 (9th Cir. 1964).

3    Moreover, no such prohibition applies where a defendant waives his right to remain silent

4    and voluntarily speaks after receiving *Miranda* warnings. *Anderson v. Charles,* 447 U.S. 404,

5    408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam). That is, "a defendant who voluntarily

6    speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject

7    matter of his statements, the defendant has not remained silent at all." *Id.* As stated by the Ninth

8    Circuit: "[T]alking is not silence. Thus, when a defendant chooses to speak, the prosecutor can,

9    surely, explore that speech and its implications." *Leavitt v. Arave,* 383 F.3d 809, 827 (9th

10   Cir.2004) (citations omitted). In such circumstances, the prosecutor may appropriately "point out

11   inconsistencies[ ]" and explore the "omission of critical details[.]" *Id.* (citations omitted).

12   In Ground 8, Petitioner states that his due process rights were violated because a

13   detective, David DeVault, was allowed to testify that Petitioner refused to be tape recorded and

14   refused to give a formal statement. Dkt. 3 at 29. Petitioner states he had a right to remain silent

15   under *Miranda* and the right to refuse to be recorded under state law. *Id.*

16   The state supreme court denied Ground 8, ruling:

17       During the November 1998 interview, Gregory declined to be tape recorded. At
         trial, the prosecutor asked DeVault, "[d]uring that [interview], did you ask him if
18       you could record your conversation with him?" MRP at 6005. Defense counsel
         objected as to relevance. The jury was excused, and the prosecutor replied that lack
19       of a tape recording would be relevant "if there is any attack at all regarding the
         accuracy or veracity of the reported statements by Detective DeVault." MRP at
20       6006. The defense noted that it had not challenged the contents of DeVault's
         statement and argued again that the refusal to be tape recorded was not relevant.
21       The trial court concluded that the testimony was admissible. DeVault testified that
         "[Gregory] didn't want the conversation recorded. He didn't trust the recordings."
22       MRP at 6015. Later, the prosecutor asked, "[d]id you ask [Gregory] that day if he
         wished to give you a formal statement about that case?" MRP at 6019. DeVault
23       replied, "I continued to try to get him to talk to me about it. I asked him if he would
         like to give a formal statement, with or without the recorder, and he declined to do

24

so." MRP at 6019. This exchange did not draw an objection. Gregory does not point to any instance where the prosecutor referred to this testimony in closing arguments.

Gregory now argues that DeVault's testimony improperly commented on his right to remain silent. Because this argument is raised for the first time on appeal, Gregory must establish that the alleged constitutional error was manifest. RAP 2.5(a). Yet, it is unclear how DeVault's testimony implicates Gregory's Fifth Amendment right to remain silent where Gregory did not remain silent. Although he declined to be tape-recorded, he discussed the crime with DeVault, denying ever having been inside G.H.'s house or ever having sex with her. Gregory does not seem to have refused to answer any question posed to him. While Gregory attempts to draw a comparison between this case and *State v. Silva,* 119 Wash.App. 422, 81 P.3d 889 (2003), *Silva* involved a defendant who answered preliminary questions but then refused to answer more incriminating questions about the crime. *Id.* at 426–27, 81 P.3d 889. The detective in *Silva* testified that when confronted with specific incriminating facts during the interview, he expected Silva to affirm or deny those facts but, instead *Silva* remained silent and did not answer the question. *Id.* While Silva clearly exercised his Fifth Amendment right to remain silent, Gregory does not establish that his refusal to be recorded or make a formal statement implicates the Fifth Amendment right where there was no testimony that Gregory ever refused to answer a question.

Gregory also argues that DeVault's testimony commented on a statutory right not to be recorded without his consent and that such a comment violates due process. RCW 9.73.030 states that except as otherwise provided in the statute, the State may not record any private conversation without first obtaining the consent of all parties. RCW 9.73.030(1)(b). Gregory asserts that the statute creates a right to decline to be recorded which cannot be commented upon at trial. *See State v. Carneh,* 153 Wash.2d 274, 289, 103 P.3d 743 (2004) (listing cases in which Washington courts have held that the State may not invite the jury to infer guilt from the exercise of a statutory privilege). Even assuming Gregory is correct that the statute creates the described right, testimony constitutes an improper "comment" on a right only if the State invites the jury to infer guilt from the exercise of the right. *See id.* at 289–90, 103 P.3d 743; *State v. Lewis,* 130 Wash.2d 700, 707, 927 P.2d 235 (1996) ("A comment on an accused's silence occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt."); *State v. Henderson,* 100 Wash.App. 794, 798, 998 P.2d 907 (2000) ( " 'Comment' means that the State uses the accused's silence to suggest to the jury that the refusal to talk is an admission of guilt."). Here, DeVault's testimony regarding Gregory's refusal to give a formal statement or allow recording was not mentioned in closing arguments, nor was it used to imply guilt. The prosecutor asked the question to defend against any attack on the accuracy or veracity of the reported statements. We conclude that the testimony did not amount to a comment even if RCW 9.73.030 created the suggested statutory right, nor did the testimony implicate Gregory's Fifth Amendment right to remain silent.

Dkt. 13-1 at 48-49; *Gregory*, 158 Wash. 2d at 836–38.

Petitioner offers nothing in his Petition or Traverse to demonstrate that the state court of appeals decision was either contrary to, or constituted an unreasonable application of, federal law. Here, Petitioner simply refused to be recorded or provide a formal statement. The record supports the conclusion that Petitioner did not invoke his right to remain silent because he continued to speak to DeVault. Moreover, Petitioner does not argue that the prosecutor used this evidence in during closing arguments. The record reflects the prosecutor elicited the testimony for accuracy, veracity, and impeachment purposes. Therefore, Petitioner has not shown the state court of appeal's decision was contrary to, or an unreasonable application, of clearly established federal law. Accordingly, Ground 8 of the Petition should be denied.

In Ground 9, Petitioner states the state was allowed to introduce evidence that DeVault had asked Petitioner's grandmother to tell Petitioner to call DeVault, but Petitioner never did. Dkt. 3 at 29. Petitioner contends this evidence was used in closing arguments to show Petitioner's guilt in violation of his Fifth Amendment right to remain silent.

When denying Ground 9, the state supreme court found:

The State asserted at trial that soon after G.H.'s murder, Detective DeVault asked Mae Hudson, Gregory's grandmother, to have Gregory contact the detective. The State sought to question Hudson about this fact. Defense counsel argued that such testimony would improperly comment on Gregory's Fifth Amendment right to prearrest silence. When Hudson testified, she denied ever having been asked to give such a message to Gregory. Later in the State's case, DeVault testified that although Gregory was not home when he initially canvassed the neighborhood, he left a business card with Hudson and asked her to pass a message to Gregory that the detective wished to talk to him. He also explained that Hudson later reported that she had relayed the message. That testimony drew a hearsay objection which was sustained. Defense counsel did not make any other objection to this portion of DeVault's testimony. DeVault then explained that he contacted Gregory at the Hudson home three days after G.H.'s body was found. Based on this testimony, the prosecutor, during closing, argued:

1
2
3
4
5

> [Gregory] is not there when the detectives go to talk to him. His grandmother is. It's not necessarily suspicious that the defendant isn't there when the detectives go to talk to him. But three days go by after Detective DeVault says to Ms. Hudson, [p]lease have Allen Gregory give us a call. No word. By the time Detective DeVault goes out to Mae Hudson's house to talk to Allen Gregory, the defendant knows that his grandmother has told the police that he was not home when she checked the bedroom at about 1:30 in the morning on the night of the killing.

MRP at 6714.

6
7
8
9
10
11

The only unsuccessful defense objection was to the questioning of Mae Hudson, and that questioning produced only Hudson's denial that DeVault had asked her to pass a message to Gregory. Defense counsel did not object to DeVault's testimony on Fifth Amendment grounds, and he did not object to the prosecutor's closing argument. Without objection at trial, reversal based on either is warranted only if there has been a manifest error affecting a constitutional right. RAP 2.5(a). "[T]he appellant has the burden to demonstrate that the alleged error actually affected his or her rights. '[I]t is this showing of *actual prejudice* that makes the error "manifest", allowing appellate review.'" *State v. McNeal,* 145 Wash.2d 352, 357, 37 P.3d 280 (2002) (quoting *State v. McFarland,* 127 Wash.2d 322, 333, 899 P.2d 1251 (1995)).

12
13
14
15
16
17
18
19
20

This court has been clear that the State may not comment on the accused's exercise of his Fifth Amendment prearrest right to remain silent. *See State v. Sweet,* 138 Wash.2d 466, 480–81, 980 P.2d 1223 (1999); *Lewis,* 130 Wash.2d at 705–06, 927 P.2d 235; *Crane,* 116 Wash.2d at 331, 804 P.2d 10. However, not all remarks amount to a "comment" on the exercise of a constitutional right. *Sweet,* 138 Wash.2d at 481, 980 P.2d 1223; *Lewis,* 130 Wash.2d at 706, 927 P.2d 235. In *Crane,* we characterized the issue as "whether the prosecutor manifestly intended the remarks to be a comment on that right." *Crane,* 116 Wash.2d at 331, 804 P.2d 10. The *Crane* court then noted that a prosecutor's statement will not be considered a comment on a constitutional right to remain silent if "standing alone, [it] was 'so subtle and so brief that [it] did not "naturally and necessarily" emphasize defendant's testimonial silence.'" *Id.* (second alteration in original) (quoting *State v. Crawford,* 21 Wash.App. 146, 152, 584 P.2d 442 (1978)). Then, in *Lewis,* we concluded that "[a] comment on an accused's silence occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." 130 Wash.2d at 706–07, 927 P.2d 235 (citing *Tortolito v. State,* 901 P.2d 387, 390 (Wyo.1995)).

21
22
23
24

Under *Crane* and *Lewis,* DeVaul's testimony and the prosecutor's reference in closing argument to the fact that Gregory failed to contact DeVault for three days did not amount to comments on prearrest silence. Gregory did not refuse to talk with police; to the contrary, he freely discussed with DeVault his whereabouts on the night in question. The State explains that DeVault's testimony was offered to

explain the investigative process in this case, not to comment on Gregory's delay in contacting police. The prosecutor's argument implies that the delay gave Gregory time to make his story consistent with the statement given by his grandmother, but it does not imply that he was avoiding the police because he was guilty. Furthermore, the prosecutor's argument regarding suspiciousness was so subtle and brief that it did not naturally and necessarily emphasize any testimonial silence. Neither the testimony nor the argument amounted to a comment on Gregory's right to remain silent.

Dkt. 13-1 at 49-50; *Gregory*, 158 Wash. 2d at 838–40.

Like Ground 8, the record supports the conclusion that Petitioner did not invoke his right to remain silent because he did not refuse to speak with DeVault. The state used the evidence of Petitioner's failure to call DeVault to show a delay and an opportunity to ensure Petitioner's conversation with DeVault was consistent with Petitioner's grandmother's story. *See* Dkt. 13-5 at 1710-12. Further, the information Petitioner provided to DeVault during this portion of his investigation was used to argue Petitioner had made inconsistent statements to DeVault at a later time. *See id*. The introduction of evidence that Petitioner did not call DeVault after DeVault asked Petitioner's grandmother to have Petitioner call DeVault was not used to show guilt. Therefore, Petitioner has not shown the state court of appeal's decision was contrary to, nor an unreasonable application, of clearly established federal law. Accordingly, Ground 8 of the Petition should be denied.

### III.    Evidentiary Hearing

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. The Court does not find it necessary to hold an evidentiary hearing because, as discussed in this Report and Recommendation, Petitioner's grounds for relief may be resolved on the existing state court record.

## IV.    Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to the Petition.

## V.    Conclusion

For the above stated reasons, the Court concludes Petitioner has not shown Ground 4 is cognizable under § 2254 and has not shown the state court's adjudication of the remaining eight grounds raised in the Petition was contrary to, or an unreasonable application of, clearly established federal law. Additionally, an evidentiary hearing is not necessary. Therefore, the Court recommends the Petition be denied and a certificate of appealability not be issued.

1    Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

2    fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

3    6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

4    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

5    objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

6    *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

7    imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on

8    April 12, 2024, as noted in the caption.

9    Dated this 27th day of March, 2024.

10

11

12   David W. Christel
     United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24